IDA M. HEIM, APPELLEE, V. FIRST NATIONAL BANK OF
HUMBOLDT, APPELLANT.

FILED JUNE 8, 1906. No. 14,367.

Banks: DEPOSITS: ACTION. A party went to the banking house of the
defendant bank to make a time deposit, and asked the president
of the bank what interest they were paying on money. His own
testimony is to the effect that he asked the party what amount
she had and how long it would be left. The reply was: About
$1,600, to be left for six months. He replied: "The bank is pay-
ing three per cent., but since you have come up here so far I
will pay you four." The party then handed him an eastern draft
for an amount exceeding $1,600, and he wrote out and returned
a time check for the amount, payable at the bank in six months,
with interest at four per cent. This time check was signed by
the president in his individual capacity, and it contained nothing
to indicate that the money was deposited with the bank or that
the bank assumed any obligation for its repayment. *Held*, That
the depositor might recover from the bank in an action for
money had and received.

APPEAL from the district court for Richardson county:
WILLIAM H. KELLIGAR, JUDGE. *Affirmed.*

*F. Martin, E. Falloon* and *Stewart & Munger,* for appel-
lant.

*J. H. Broady, contra.*

DUFFIE, C.

In March, 1903, Mrs. Ida M. Heim received $1,652.42
from her father's estate. The amount was sent her in a
draft drawn by the Citizens State Bank of Keithburg, Illi-
nois, on the Continental National Bank of Chicago. The
testimony discloses that Mr. and Mrs. Heim, who reside
on a farm near Dawson, intended to build a new dwelling
house that season, and they concluded to deposit the
money in some bank where it would draw interest as a
time deposit for six months, and where it would be imme-
diately available for use when they commenced their build-

ing operations. The bank at Dawson was not paying interest on deposits, and the testimony of the plaintiff is to the effect that she indorsed the draft in blank and gave it to her husband, who drove to Humboldt for the purpose of depositing it in the First National Bank at that place. F. W. Samuelson was president of the First National Bank of Humboldt and had occupied that position for about 20 years. Mr. Heim relates what took place between himself and Mr. Samuelson in the following language: "I stepped up to the window, and Mr. Samuelson came forward, and I told him my wife had some money and she wanted to leave it at the bank. I asked him if they were paying any interest on time deposits, and he asked me my name and where I was from, and I told him. He wanted to know what amount I had, and I told him, and I asked him how much interest he would pay if I left it six months, and he said, 'We usually pay but 3 per cent., but since you have come up here so far I will give you 4 per cent. I told him all right, I would leave it, and he went and wrote out a paper and handed it to me, and I took it." The paper referred to, and which Samuelson gave in acknowledgment of the money, is in the following language: "F. W. Samuelson, Loans. $1,652. Humboldt, Neb., Mar. 12, 1903. Pay to the order of Ida M. Heim $1,652.42, sixteen hundred fifty-two and 42-100 dollars. Due in six months at 4% Int. F. W. Samuelson. Payable at The First National Bank, Humboldt, Neb." Mr. Heim returned with this paper to his home near Dawson, where he and his wife read and examined it, after which they put it in an envelope and placed it in the safe of Mr. Heim's brother, a merchant doing business in Dawson, where they kept other papers. Both Mr. and Mrs. Heim testified that they had never seen a certificate of deposit; and this was the first transaction of the kind they ever had and they supposed that the paper given them by Mr. Samuelson was regular in all respects. Samuelson failed in the summer or fall of 1903, and sent Mrs. Heim a notice stating that fact and requesting her to meet him in an office at Falls City. Upon

receiving this notice the paper was taken from the safe, and its true character ascertained from the cashier of the bank at Dawson, and thereupon this action was commenced to recover from the bank the sum of $1,652.42, which the petition alleges was deposited in the bank by Mrs. Heim. The petition contains a detailed statement of the facts. The answer of the bank is a general denial, except that it admits that Samuelson was president of the bank at the time of the transaction. The jury returned a verdict in favor of the plaintiff, upon which judgment was entered, and the defendant has appealed the case to this court.

Samuelson was called as a witness for the defendant, but, before giving his version of the occurrence, it might be well to state that Mrs. Heim had testified that she had never been in the Humboldt bank, and both Mrs. Heim and her husband testified that on the day of the transaction she visited her husband's mother and was there when Mr. Heim returned from Humboldt. His story of the transaction is as follows: "Q. Now, you may go on and tell the jury what took place at that time—what conversation took place between you and him at that time? A. It puts me in rather an embarrassing situation, for the reason Mrs. Heim testified she was not in the bank that day. Q. Go on and tell which one of them did this business. Give your version of it. A. Mr. and Mrs. Heim were both in the bank that day. Q. Now, who transacted that business with you, Mr. or Mrs. Heim? A. Mrs. Heim. Q. What conversation took place between you and Mrs. Heim leading up to this paper that Judge Broady introduced in evidence, the time check? A. Mrs. Heim and Mr. Heim came into the bank on the 13th day of March, 1903, and Mrs. Heim stepped up to the counter and asked what interest we would pay on money, or 'what interest will you pay on money,' and I asked her how much she wanted to leave, and she said about $1,600. I asked her how long a time she wanted to leave it, and she said about six months. Q. What did you tell her? A. I said to her the bank was paying 3 per cent. interest, but that I would pay her 4 per cent. Q.

56

What did she say? A. She then handed me the draft or check on some eastern bank, and she indorsed it, and then I went to my private check book and wrote a check payable to Mrs. Ida M. Heim for $1,652.42, drawing 4 per cent. interest on six months time, payable at the First National Bank of Humboldt, Nebraska. Q. You say, at the time, she gave you the draft on some bank in the east? A. Yes, sir. Q. That is the draft introduced in evidence? A. I think so. Q. What did you do with that? A. I deposited the draft to my credit in the First National Bank of Humboldt." The defendant's evidence further showed that Samuelson had received credit on his pass book for the amount of this draft.

It is strenuously insisted by the bank that the transaction was one between Mrs. Heim and Samuelson; that e bank never received the money; that it was a loan made to Samuelson individually and for which the bank cannot be held liable. If we place the evidence of Mr. Heim and Mr. Samuelson side by side, and read the statement of each relating to what transpired in the bank, no express words used by the parties could make it clearer that Heim wished to deposit this money with the bank, and that Samuelson so understood it. Whether it was Mr. or Mrs. Heim who visited the bank, the purpose was to make a deposit, and not a personal loan to Samuelson. For nearly 20 years he had been president of the defendant bank. It is probably true that during this time he was engaged in many private transactions in which the bank had no interest, and it may be true that he borrowed money on his own account from outside parties, but the question asked him concerning this particular deposit was what interest the bank was paying on deposits, which was a clear indication that the customer wished to deal with the bank, and not with him in his individual capacity. The fact that he replied, "The bank is paying 3 per cent., but I will pay you 4 per cent.," could leave but one impression upon the mind of a customer who came for the purpose of making the deposit there, viz., that the bank would make an exception in his favor and that 4

per cent. would be allowed by the bank on that particular deposit. We must bear in mind that the customer went to the bank for the purpose of making a deposit, and with no thought of effecting a private loan; that the talk which he had was with the president of the institution; that Samuelson represented the institution, and what he said was taken by the customer as speaking for the bank. It was the bank that was speaking, in contemplation of the customer, and to make it a dealing with Samuelson individually a plain statement putting the customer upon notice and imparting knowledge of that fact should be made to appear. It is true that Samuelson did not, in words, represent that the paper given the Heims was the paper of the bank; but the circumstances of the case, the conversation had even on his own version of it, can leave no doubt that it led the customer to believe he was receiving a certificate of deposit issued for the bank and by the bank, and we have no doubt that Samuelson himself was fully aware that such was the case and desired it to be so understood. Actions often speak louder than words, and this is as true where fraud is attempted and perpetrated as in other matters.

Section 341 of our code is peculiarly applicable to the facts here shown. It provides: "When the terms of an agreement have been intended in a different sense by the parties to it, that sense is to prevail against either party in which he had reason to suppose the other understood it." Again, this case seems to be ruled by *Patterson v. First Nat. Bank,* 73 Neb. 384. *Ziegler v. First Nat. Bank,* 93 Pa. St. 393, is a case in point. We cannot do better than to quote the language of Judge Paxton in that case:

"When the plaintiff took his money to the First National Bank of Allentown, and handed it to the cashier for deposit, the bank became responsible therefor. The cashier was the executive officer of the bank, and authorized by the very nature of his office to receive money on deposit. After receiving it, no trick or fraud on his part, by means of which the money was passed over to Blumer & Co., a

firm in which the bank officers were largely interested, and appeared to have had the control, could absolve the bank from its liability. No class of men have the confidence of the people to a greater extent than bank officers. Depositors do not deal with them at arm's length, and can be imposed upon with the greatest ease by such officials. It would be monstrous to allow them to take advantage of the ignorant and unwary, by reason of their position and the confidence which it inspires. It was doubtless a misfortune to this bank to have unworthy officials, if such should prove to be the case. It certainly was unwise to permit its chief officers to occupy a dual position with divided interests, but the consequences resulting therefrom cannot be visited upon those who dealt in good faith with the bank."

*Coleman v. First Nat. Bank,* 53 N. Y. 388, is also directly in point. In that case the plaintiff handed a sum of money to defendant's teller in defendant's banking office and over its counter, stating he desired to leave it on deposit with the bank. The teller gave him a certificate which was in form an acknowledgment that plaintiff had deposited the money with S. R. VanCampen and contained a personal obligation on the part of the latter to repay the amount. VanCampen was the bank president. The certificate was signed by him, but not in his official capacity. The bank was not named in it, and there was nothing on its face indicating that the money was deposited with the bank or that it assumed any obligation in respect thereto. Plaintiff did not read the certificate when he received it. In an action to recover the amount of the deposit, it was held that the plaintiff was not precluded by the certificate; that the doctrine of constructive notice of its contents from the fact of possession thereof did not apply, and that it was a question of fact for a jury whether the deposit was with the defendant or VanCampen.

In the case we are considering it is not entirely clear that the bank did not in fact get the benefit of this money. It is true that Samuelson testifies that he deposited the

draft to his own private account, but the draft does not bear his indorsement. It is a rule so universally observed among bankers that judicial notice thereof may well be taken, that all deposits of paper of this character made either by regular customers or by officers and employees of the bank must bear the indorsement of the party making the deposit. This is for the purpose of informing the bank from whom the deposit came, and to allow its officers to trace the paper to the party from whom it was received in case inquiry and investigation become necessary. The objections to the instructions urged by the appellant do not require discussion. We think they were as favorable to the bank as the law and the testimony required. The jury were fully informed regarding the legal rules which should govern them in arriving at their verdict, and hypercritical objections to instructions which fairly reflect the law of the case and which in reason are not calculated to mislead the jury should not be encouraged or work a reversal where no injustice has been done.

We recommend an affirmance of the judgment.

ALBERT and JACKSON, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.